UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
_____

STATE OF NEW YORK and the
NEW YORK STATE DEPARTMENT
OF ENVIRONMENTAL CONSERVATION,

                          Plaintiffs,

             -against-

KURT WEISS GREENHOUSES, INC.,
the Estate of RUSSELL WEISS, KIRK WEISS,
WAYNE WEISS, HENRON DEVELOPMENT
CORPORATION, PHELPS LANE
DEVELOPMENT CORPORATION, and
HENRY C. SCHREIBER, JR.,

                        Defendants.
_____

**COMPLAINT**

**NO. 21-cv-3752**

Plaintiffs State of New York and the New York State Department of Environmental Conservation ("DEC") (collectively, the "State"), by their attorney Letitia James, Attorney General of the State of New York, as and for their complaint, allege as follows, upon information and belief:

## NATURE OF THE ACTION

1.      This is an action under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601-9675 ("CERCLA"), as amended, and New York common law to recover costs that have been and will be incurred by the State in responding to the releases and threatened releases of hazardous substances into the environment at and from the property located at 25 Orchard Road in East Patchogue, Suffolk County, New York ("the Site").

2.      This action seeks (a) recovery of the State's response costs incurred to

date, and (b) a declaration of liability for the State's future response costs.

## JURISDICTION AND VENUE

3.     This Court has exclusive jurisdiction over the First Claim for Relief, which arises under the laws of the United States, pursuant to 28 U.S.C. §§ 1331 and 2201 and 42 U.S.C. §§ 9607 and 9613. The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the Second Claim for Relief, which is based upon New York common law and arises out of a common nucleus of operative facts shared with the first Claim for Relief. The Court also has jurisdiction to enter a declaratory judgment under 28 U.S.C. §§ 2201 and 2202, as well as 42 U.S.C. § 9613.

4.     Venue is proper in this District pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because the threatened and actual releases of hazardous substances that give rise to this action occurred and/or are occurring within this District and the Site is located within this District.

## THE PARTIES

5.     Plaintiff State of New York is a body politic and sovereign entity, which brings this action as *parens patriae* on behalf of its citizens and residents.

6.     Plaintiff DEC is an executive agency of the State of New York, and is authorized to administer and enforce the New York Environmental Conservation Law.

7.     Plaintiffs bring this action to recover costs that have been and will be incurred by the State in responding to the release and threatened release of hazardous substances at and from the Site.

8.     Defendant Kurt Weiss Greenhouses, Inc. ("KW Greenhouses") is a

company organized and existing under the laws of New York with its principal business address at 95 Main Street, Center Moriches, NY 11934. KW Greenhouses operated the Site from 1992 to 2005.

9.      Defendant Estate of Russell Weiss is the estate of Russell Weiss, an individual who resided at 2 Alexandra Way, Westhampton, NY 11977, and was an owner, principal, executive and/or officer of KW Greenhouses. Russell Weiss owned the Site from November 10, 1992 to November 2, 2005. Russell Weiss also managed, directed, and conducted operations related to the disposal of hazardous waste at the Site, and made decisions about compliance with environmental laws and regulations. Russell Weiss passed away in June 2021.

10.     Defendant Kirk Weiss, an individual residing at 95 Main Street, Center Moriches, NY 11934, is or has been an owner, principal, executive and/or officer of KW Greenhouses. Kirk Weiss owned the Site from November 10, 1992 to November 2, 2005. Kirk Weiss also managed, directed, and conducted operations related to the disposal of hazardous waste at the Site, and made decisions about compliance with environmental laws and regulations.

11.     Defendant Wayne Weiss, an individual residing at 84 Inlet View Path, East Moriches, NY 11940, is or has been an owner, principal, executive and/or officer of KW Greenhouses. Wayne Weiss owned the Site from November 10, 1992 to November 2, 2005. Wayne Weiss also managed, directed, and conducted operations related to the disposal of hazardous waste at the Site, and made decisions about compliance with environmental laws and regulations.

12.     Defendant Henron Development Corporation ("Henron") is a company organized under the laws of New York with its principal business address at 2150 Smithtown Avenue, Ronkonkoma, NY 11779. Henron owned the Site starting on or about November 2, 2005. Henron also managed, directed, and conducted operations related to the disposal of hazardous waste at the Site, and made decisions about compliance with environmental laws and regulations.  While Henron is still the legal owner of the Site, it has failed to pay taxes on the property since at least 2016, and the Suffolk County Landbank Corporation is currently soliciting proposals for redevelopment of the Site. Henron dissolved on January 30, 2018.

13.     Defendant Phelps Lane Development Corporation ("Phelps") is a company organized and existing under the laws of New York with its principal business address at 2150 Smithtown Avenue, Ronkonkoma, NY 11779. Phelps managed, directed, and conducted operations related to the transportation and disposal of hazardous waste at the Site in or about 2006.

14.     Defendant Henry C. Schreiber, Jr. ("Schreiber"), an individual residing at 17 Jayme Drive, North Babylon, NY 11703, is or has been an owner, principal, executive and/or officer of Henron and Phelps. Schreiber managed, directed, and conducted operations related to the disposal of hazardous waste at the Site, and made decisions about compliance with environmental laws and regulations.

## STATUTORY AND REGULATORY BACKGROUND

## CERCLA

15.     The State's First Claim for Relief is based on CERCLA, which provides that, when there is a release or a threatened release of hazardous substances into

the environment from a facility, certain categories of persons are liable to the State for the costs that the State incurs to respond to the release or threatened release so long as the State's response actions are "not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a).

16.     "Hazardous substances" are defined in 42 U.S.C. § 9601(14) to include substances that United States Environmental Protection Agency (EPA) has designated as hazardous under 42 U.S.C. § 9602. The substances that EPA has designated as hazardous are listed in 40 C.F.R. § 302.4.

17.     A "release" includes spilling, leaching, and disposing "into the environment." *Id.* § 9601 (22). "Environment" includes surface water, groundwater, drinking water supply, land surface and subsurface strata. *Id.* § 9601(8).

18.     A "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601 (9). It also includes buildings, structures, and equipment. *Id.*

19.     "Respond" includes taking "removal actions," "remedial actions," and related enforcement activities. *Id.* § 9601(25). "Removal" includes the cleanup or removal of released hazardous substances from the environment and the assessment and evaluation of a release. *Id.* § 9601(23). "Remedial action" means "those actions consistent with permanent remedy taken instead of or in addition to removal actions." *Id.* § 9601(24).

20.     The "national contingency plan" is set out at 40 C.F.R. Part 300.

21.     The persons liable for response costs under 42 U.S.C. § 9607(a) include

(1) current owners and operators of a facility, (2) owners and operators of a facility at the time of disposal of hazardous substances, and (3) persons who transport and then dispose of hazardous substances. "Persons" includes corporations. 42 U.S.C. § 9601(21).

22.     42 U.S.C. 9613(g)(2) provides that, in an action for response costs, "the court shall enter a declaratory judgment on liability for response costs" that "will be binding in any subsequent action or actions to recover further response costs."

**New York Public Nuisance Law**

23.     The State's Second Claim for Relief is based on New York common law, and seeks to recover funds that the State has spent and will spend abating the public nuisance resulting from contamination at the Site.

24.     A public nuisance is a condition that offends, interferes with, or causes damage to the public in the exercise of rights common to all, in a manner such as to, among other things, endanger or injure the property, health, safety, or comfort of a considerable number of persons.

25.     Persons who cause or contribute to the creation or maintenance of a public nuisance are strictly, and jointly and severally, liable for its abatement.

## FACTUAL ALLEGATIONS

26.     The Site is located at 25 Orchard Road in East Patchogue, Suffolk County, New York, covers approximately 14 acres, and is surrounded by residential properties.

27.     The Site is identified on the Suffolk County Tax Map as District 0200, Section 979.60, Block 3, Lots 002.000, 008.000, 009.000, 011.000, and 020.001 (also

known as Lot 20.1).

28.     Until 2006, the approximately 9.5-acre southern portion of the Site contained six greenhouses, and the approximately 4.5-acre northern portion of the Site had a wooded and open vegetation area. The greenhouses had unlined, dirt floors or other pervious surface covering.

## Non-parties I.W. Bianchi, Inc. and Bianchi Orchids, Inc.'s Operations

29.     Non-parties I.W. Bianchi, Inc. and Bianchi Orchids, Inc. (collectively, "Bianchi Corporations") operated commercial greenhouses on the Site from approximately 1929 to 1990.

30.     The Bianchi Corporations grew orchids in one or more greenhouses, and in the growing process, applied the pesticide chlordane, which was absorbed directly onto the dirt floors of the greenhouses and which eventually moved through the unsaturated soil (that is, the layer of soil between the land surface and groundwater) and entered the groundwater beneath the Site.

31.     Chlordane was used in the United States starting in 1947. However, EPA banned its use for home, garden, and agricultural applications in 1983 based on the adverse health consequences of exposure to chlordane in the application process and/or through contact with contaminated soil, surface water and drinking water. Chlordane was allowed for subterranean termite soil injection until 1988, when all uses were banned.

32.     Chlordane in soil can migrate into groundwater, particularly in areas like the Site where the water table is shallow, that is, 5-10 feet below ground surface.

33.     EPA has found that chlordane in drinking water can cause the following health effects when people are exposed to it for even relatively short periods of time: central nervous system effects, including excess salivation, labored breathing, tremors, convulsions, and deep depression, and blood system effects such as anemia and certain types of leukemia. EPA has also found that lifetime exposure to chlordane can cause damage to the liver, kidneys, lungs, spleen, and adrenal glands, and cancer. EPA Fact Sheet, National Drinking Water Regulations, Chlordane (October 1995).

34.     EPA has designated chlordane, including its alpha and gamma isomers, as a hazardous substance. 40 C.F.R. § 302.4.

35.     The Bianchi Corporations are dissolved. I.W. Bianchi, Inc. was dissolved on August 23, 1989 and Bianchi Orchards, Inc. was dissolved on September 29, 1993.

**KW Greenhouses and the Weiss Family's Operations**

36.     Defendants Russell Weiss, Kirk Weiss, and Wayne Weiss (collectively with KW Greenhouses, "Weiss Defendants") purchased the Site on or about November 10, 1992.

37.     The Weiss Defendants operated commercial greenhouses on the Site from 1992 to 2005.

38.     As commercial greenhouse operators, the Weiss Defendants knew or should have known that the dirt inside the greenhouses had been exposed to pesticides while orchids were grown there by the Bianchi Corporations.

39.     When the Weiss Defendants operated the Site, they moved large

quantities of chlordane-contaminated dirt from the greenhouse floors and placed it in piles in the northern portion of the Site.

40. The Weiss Defendants subsequently spread the piles of contaminated dirt over the northern portion of the Site.

**Henron, Phelps, and Schreiber's Operations**

41. Henron purchased the Site on or about November 2, 2005, to build a residential subdivision called "Winwood Oaks at East Patchogue."

42. When Henron purchased the Site, the following structures were on the Site: (a) six greenhouses; (b) storage building; (c) residential dwelling; (d) generator building; (e) horse barn, and (f) garage.

43. In March 2005, before Henron purchased the Site, Enviroscience Consultants, Inc. ("Enviroscience") tested soil in and near the greenhouses on the Site on behalf of Henron. The testing showed that chlordane and lead exceeded soil screening levels established by the EPA for protection of human health. That testing also revealed elevated levels of other contaminants.

44. In a letter dated April 22, 2005, Enviroscience notified the Suffolk County Department of Health Services ("Suffolk County") of the results of its March 2005 sampling. Enviroscience proposed a "soil management plan" to address the soil contamination and requested Suffolk County's approval of the plan.

45. In a letter dated May 26, 2005, Suffolk County responded that it concurred with the soil management plan with certain modifications, including additional sampling and dust control measures. Suffolk County also stated that

Enviroscience should notify it and the Town of Brookhaven ("Brookhaven") before implementing the soil management plan so that Suffolk County and Brookhaven could perform inspections.

46.     Enviroscience did not respond to Suffolk County's May 2005 letter.

47.     In June 2005, Environscience also tested soil in the northern portion of the Site, outside of the footprint of the former greenhouses, and found elevated levels of chlordane that exceeded soil cleanup objectives.

48.     On March 8, 2006, Brookhaven issued a 30-day demolition permit to Henron and/or Phelps to demolish the structures on the Site.

49.     In or about March 8, 2006, Henron and Phelps, both under Schreiber's control, began demolition of the structures on the Site, including the greenhouses ("Spring 2006 Demolition"). They did not submit a dust management plan to Suffolk County prior to starting the demolition.

50.     On March 24, 2006, Suffolk County sent Henron a letter recommending against any significant physical disturbance of the Site, including the greenhouses, without a more detailed soil management plan.

51.     During the Spring 2006 Demolition, Henron and Phelps, both under Schreiber's control, did not (a) ensure that soil that had been found to be contaminated with chlordane, lead, and other contaminants was properly disposed and not moved to other locations on the Site; (b) ensure that lead paint on the greenhouses and other structures was properly disposed; or (c) prevent the migration of chlordane, lead, and other contaminants to other locations on or off the

Site.

52.    Lead paint on the greenhouses and buildings at the Site flaked and chipped off into the surrounding site soil during the course of the Spring 2006 Demolition.

53.    Henron and Phelps, both under Schreiber's control, moved soil that had been in or around the greenhouses and had been contaminated with chlordane, lead, and other contaminants to other locations on the Site during the course of the Spring 2006 Demolition.

54.    EPA has found that exposure of children to lead can cause behavior and learning problems, lower IQ, hyperactivity, and other serious health effects. EPA has also found that exposure of adults to lead can cause serious health effects, including increased blood pressure, decreased kidney function, and reproductive problems. EPA, Learn About Lead, https://www.epa.gov/lead/learn-about-lead.

55.    EPA has designated lead as a hazardous substance. 40 C.F.R. § 302.4.

56.    On April 10, 2006, Suffolk County employees visited the Site to install wells as part of the County's groundwater investigation. They found that Henron and Phelps, both under Schreiber's control, were conducting demolition activities at the Site, even though their demolition permit had expired two days earlier. The Suffolk County employees were also concerned that Henron and Phelps were not controlling dust and stormwater runoff. Suffolk County informed Brookhaven of these concerns, causing Brookhaven to order Henron and Phelps to stop the demolition activities at the Site that day.

57.     In April 2006, after the demolition stopped, Enviroscience took samples of sediment in nine drainage structures on the Site, including leaching pools and storm drains. Enviroscience found chlordane in excess of soil clean-up standards in eight of the nine structures.

**Suffolk County's Investigation of the Site**

58.     Between April and December 2006, Suffolk County installed 43 groundwater monitoring wells on and off the Site to evaluate the extent of groundwater contamination from chlordane. Samples tested by Suffolk County showed chlordane in excess of drinking water standards. Chlordane was detected on-Site at concentrations up to 8.9 µg/L and off-Site at concentrations up to 11.9 µg/L, significantly exceeding the maximum allowable concentration of 0.05 µg/L for groundwater in New York. *See* 6 NYCRR § 703.6(e).

59.     Suffolk County conducted further off-Site monitoring between November 2007 and October 2008. Chlordane was found at concentrations up to 23 µg/L. Suffolk County also tested a puddle of surface water on the Site and found chlordane at a concentration of 1.1 µg/L.

60.     Based on historical information and its groundwater investigation, Suffolk County concluded that a groundwater plume contaminated with chlordane and other contaminants emanated from the Site and extended approximately 3,000 feet in a south/southwest direction towards Abets Creek.

61.     In July 2006, Suffolk County referred the Site to DEC.

**DEC's Investigation of the Site**

62.     In November 2006, DEC listed the Site as Site No. 152209 in the "Registry of Inactive Hazardous Waste Disposal Sites in New York State," and designated it as a "Class 2" site, indicating that it poses a significant threat to the public health or environment and remedial action is required.

63.     On November 9, 2006, Brookhaven issued a permit to Phelps to complete the demolition, with the exception of two concrete building slabs. That demolition was completed in or about November 2006.

64.     In 2006 and 2007, DEC contacted Henron and other potentially responsible parties and asked them to enter into administrative consent orders pursuant to which they would clean up the Site. DEC's efforts were not successful.

65.     In February 2008, the Site was referred to the State Superfund program for the development and implementation of a "Remedial Investigation/Feasibility Study," including "interim remedial measures." DEC also approved the use of the "hazardous waste remedial fund," also known as the State Superfund, for responding to the release of hazardous substances.

66.     In 2009, DEC took a series of interim remedial measures—which are called "removal" actions under CERCLA, 42 U.S.C. § 9601(23)—at the Site. Those measures included removing stockpiled demolition debris; excavating contaminated soil from leaching pools and other drainage structures; and implementing measures to prevent further migration of contaminated soil and surface water, including installing hay bales and silt fences, re-grading, and mulching.

13

67. In August 2011, DEC issued a report on its Remedial Investigation of the Site. The purpose of the Remedial Investigation was to evaluate the nature and extent of on-Site and off-Site groundwater contamination, determine if the Site is the source of off-Site groundwater contamination, and identify and evaluate remedial actions, *i.e.*, permanent remedies for the contamination. *See* 42 U.S.C. § 9601(24).

68. The Remedial Investigation found, among other things: (a) widespread contamination of on-Site and off-Site soil with chlordane, estimating that almost 74,000 tons of on-Site soil were contaminated; (2) contamination of on-Site soil with lead and other metals; and (3) a chlordane-contaminated plume of groundwater emanating from the Site and extending approximately 2,900 feet southwest toward Abets Creek, with a width of approximately 460 feet.

69. DEC issued a Feasibility Study for the Site in September 2011 and a "Proposed Remedial Action Plan" for the Site in October 2011. The Feasibility Study evaluated different remedial actions to address the on-Site and off-Site soil and groundwater contamination. The Proposed Remedial Action Plan outlined the remedial actions that DEC proposed to take.

70. DEC held a public meeting on or about November 14, 2011 to discuss and hear comments from the public regarding the proposed remedial actions. DEC also received comments from the public during a public comment period that ended on or about December 16, 2011. DEC responded to comments in its "Record of Decision" (ROD) for the Site.

71.    In January 2012, DEC issued its ROD, in which it described its selected remedial actions for the Site. Those remedial actions include: (1) excavating on-Site soil that exceeds residential soil clean-up objectives for alpha-chlordane, gamma-chlordane, and lead; excavating off-Site soil that exceeds the objectives for alpha- and gamma-chlordane; transporting the excavated soil for disposal at an approved facility; and replacing the excavated soil with clean fill; (2) offering property owners with private wells in or near the chlordane-contaminated groundwater plume the opportunity to connect to a public water supply; (3) offering property owners located within the shallow portion of the chlordane-contaminated groundwater plume the option of having foundation cracks sealed and sump pumps upgraded to address the infiltration of contaminated water into basements during rainstorms; and (4) restricting the use of chlordane-contaminated groundwater without water quality treatment.

72.    The ROD estimates capital costs of $7,200,000 and annual operation and maintenance costs of $55,600 for the selected remedy.

73.    In April 2014, at DEC's request, EA Engineering, P.C., collected soil samples from throughout the Site and tested them for chlordane. This testing enabled DEC to determine whether the earlier excavation of contaminated soil from leaching pools and other drainage structures had removed the chlordane "hot spots" at the Site. The testing was also done in preparation for implementing the excavation portion of the remedy chosen under the ROD. Any soil with chlordane above a certain concentration had to be treated as hazardous waste, which has specific handling,

transportation and disposal requirements.

74.    Soil samples with chlordane levels high enough to be considered hazardous waste were taken from the northern area of the Site where the Weiss Defendants had moved chlordane-contaminated soil from the footprint of the former greenhouses.

75.    EA Engineering sent DEC its findings in December 2014.

76.    On July 8, 2015, DEC issued a notice to proceed to its contractor EnviroTrac Ltd. to begin remedial actions at the Site. Site preparation activities began on September 28, 2015 and excavation of the Site started on November 5, 2015. Approximately 30,000 cubic yards of contaminated soil was removed from the Site. The remedial actions concluded on July 22, 2016.

77.    After the completion of the remedial work, some contamination was left at the Site. In June 2019, DEC approved a Site Management Plan to control exposure to this remaining contamination to ensure protection of public health and the environment.

78.    The removal and remedial actions that the State has taken and will take to respond to the release of hazardous substances at the Site are not inconsistent with the "national contingency plan," 40 C.F.R. Part 300.

79.    As of March 31, 2021, the State had incurred costs in the amount of approximately $7,137,827.84 responding to the release and threatened release of hazardous substances at the Site, including removal and remedial actions.

80.    The State will continue to incur costs responding to the release and

threatened release of hazardous substances at the Site.

81.     The selected remedy for the Site addressed the chlordane-contaminated groundwater plume by removing on-Site chlordane-contaminated soil that is the source of the chlordane in the groundwater plume and placing engineering and institutional controls on the property. The ROD estimates that it will take approximately 20 years to restore the contaminated groundwater plume to drinking water standards.

82.     Until the chlordane contaminated plume is restored to drinking water standards, the contaminated groundwater will not be available as a source of drinking water.  DEC is also monitoring groundwater in the area.

## FIRST CLAIM FOR RELIEF
## COST RECOVERY UNDER CERCLA

83.     The State repeats and realleges the allegations in the foregoing paragraphs.

84.     The Site is a "facility" as that term is defined in 42 U.S.C. § 9601(9).

85.     Buildings, structures, and equipment where hazardous substances were deposited, stored, disposed of, or placed, or otherwise came to be located at the Site are also "facilities" under 42 U.S.C. § 9601(9).

86.     There have been "releases" or threatened "releases" of "hazardous substances," as those terms are defined in 42 U.S.C. §§ 9601(14) and (22), at and from the Site, and other facilities at the Site, into the environment.

87.     Among the hazardous substances that were released and are threatened to be released into the environment at and from the Site and other facilities at the

Site are (a) chlordane, the presence of which is consistent with greenhouse operations at the Site; and (b) lead, the presence of which is consistent with lead paint on the greenhouses and other structures on the Site.

88. Chlordane and lead contaminated the "environment" within the meaning of 42 U.S.C. § 9601(8).

89. The State has incurred costs, and will continue to incur costs, to "respond," as that term is defined in 42 U.S.C. § 9601(25), to the release and threatened release of chlordane and lead at and from the Site and other facilities at the Site, including costs to assess, monitor, evaluate, oversee and conduct "removal actions" and "remedial actions," as those terms are defined in 42 U.S.C. §§ 9601(23) and (24).

90. 42 U.S.C. § 9607(a) provides that persons who (a) are current owners or operators of a facility, (b) were owners or operators at the time that hazardous materials were disposed, or (c) transported and then disposed of hazardous substances shall be liable for the costs of removal and remedial actions that are "not inconsistent with the national contingency plan."

91. The State's removal and remedial actions are not inconsistent with the national contingency plan.

92. Defendants are "persons" within the meaning of 42 U.S.C. § 9601(21).

93. Defendants Russell Weiss, Kirk Weiss, and Wayne Weiss owned the Site and facilities at the Site between 1992 and 2005, when hazardous substances were disposed at the Site, and thus are owners of the Site and other facilities at the Site

at the time of disposal within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

94. Defendants Russell Weiss, Kirk Weiss, Wayne Weiss, and KW Greenhouses managed, directed, or otherwise conducted operations at the Site and other facilities at the Site, including operations specifically related to the disposal of hazardous substances when hazardous substances were disposed at the Site, and thus are operators of the Site and other facilities at the Site at the time of disposal within the meaning of Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

95. Defendant KW Greenhouses transported and disposed of hazardous substances at the Site and other facilities at the Site to other locations at the Site and thus is a transporter of hazardous substances under 42 U.S.C. § 9607(a)(4).

96. Defendant Henron currently owns the Site and other facilities at the Site and thus is a current owner of the Site and other facilities at the Site within the meaning of Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1).

97. Defendant Henron owned the Site and other facilities at the Site when hazardous substances were disposed at the Site and is thus an owner of the Site and other facilities at the Site at the time of disposal within the meaning of 42 U.S.C. § 9607(a)(2).

98. Defendants Henron, Phelps, and Schreiber managed, directed, or otherwise conducted operations at the Site and other facilities at the Site, including operations specifically related to the disposal of hazardous substances when hazardous substances were disposed at the Site, and thus are operators of the Site

and other facilities at the Site at the time of disposal within the meaning of 42 U.S.C. § 9607(a)(2).

99. Defendants Henron and Phelps transported and disposed of hazardous substances at the Site and other facilities at the Site to other locations at the Site and thus are transporters of hazardous substances under 42 U.S.C. § 9607(a)(4).

100. Pursuant to 42 U.S.C. § 9607(a), defendants are strictly, jointly and severally liable to the State for past response costs incurred by the State as a result of the release or threatened release of hazardous substances at or from the Site and other facilities at the Site.

101. Pursuant to 42 U.S.C. §§ 9607(a) and 9613(g), defendants are strictly, jointly and severally liable for future response costs incurred by the State as a result of the release or threatened release of hazardous substances at or from the Site and other facilities at the Site.

## SECOND CLAIM FOR RELIEF
## RESTITUTION

102. The State repeats and realleges the allegations in the foregoing paragraphs.

103. The release of hazardous substances at and from the Site into the environment, including soil, stormwater, and groundwater at the Site, constitutes a public nuisance endangering public health and safety.

104. Defendants participated in the creation and/or maintenance of this public nuisance by disposing hazardous substances at the Site.

105. Defendants had and have a duty to abate this public nuisance and to remediate the contamination at and emanating from the Site.

106. Defendants have failed to do so.

107. The State has discharged and will continue to discharge the duty of defendants to abate this nuisance and to remediate the contamination at and emanating from the Site.

108. By discharging the duty of defendants to abate this nuisance and to remediate the contamination, the State has conferred a benefit upon and unjustly enriched defendants, and defendants are strictly, and jointly and severally, liable to the State in restitution for the value of the benefit conferred upon them by the State.

## **PRAYER FOR RELIEF**

WHEREFORE, the State requests judgment in its favor and against defendants upon each claim and requests that this Honorable Court enter judgment against defendants:

1. Declaring defendants to be strictly, and jointly and severally, liable to the State under CERCLA for, and awarding to the State, all costs and expenses, including interest, attorneys' fees and other costs of enforcement, incurred by the State in responding to the release or threat of release of hazardous substances at and from the Site and other facilities at the Site.

2. Declaring defendants to be strictly, and jointly and severally, liable to the State under CERCLA for all future response costs and expenses, including interest, attorneys' fees and other costs of enforcement, to be incurred by the State

in responding to the release or threat of release of hazardous substances at and from the Site.

3.      Declaring defendants to be strictly, and jointly and severally, liable to the State in restitution, and awarding to the State all past and future costs and expenses, including interest, attorneys' fees and other costs of enforcement incurred by the State in abating the public nuisance at and in the vicinity of the Site.

4.      Ordering such other and further relief, in law or in equity, as the Court deems just and proper.

Dated:      New York, New York
             July 2, 2021

                        LETITIA JAMES
                        Attorney General of the State of New York
                        Attorney for Plaintiffs

                    By:   */s/ Laura Mirman-Heslin*
                        Laura Mirman-Heslin
                        Assistant Attorney General
                        Yueh-ru Chu
                        Chief, Affirmative Litigation Section
                        Environmental Protection Bureau
                        28 Liberty Street
                        New York, NY 10005
                        (212) 416-6091